Ixia Leal, as Guardian of the Person of Charles Leal, a Mentally Retarded Person, Respondent, v Sheldon Simon et al., Appellants.

Second Department, June 12, 1989

## APPEARANCES OF COUNSEL

*Rivkin, Rader, Dunne & Bayh* (*Evan H. Krinick* and *Frank L. Amoroso* of counsel), for Sheldon Simon, appellant.

*Meyer, Suozzi, English & Klein, P. C.* (*Bernard S. Meyer, Patrick J. Purcell, Kenneth L. Gartner* and *Larry J. Bonchonsky* of counsel), for United Cerebral Palsy Association of Nassau County, Inc., appellant.

*Blume, Easton & Clark* (*Alan W. Clark, Robert S. Blume, Mark Easton, Richard J. Kaufman, Deborah S. Kurtz* and *David J. Sobel* of counsel), for respondent.

## OPINION OF THE COURT

Rubin, J.

This action arises from the defendant Dr. Simon's treatment in 1982 of Charles Leal, a 36-year-old individual who was born severely mentally retarded and blind. While he was treated by

Dr. Simon, Charles was a resident of an intermediate care facility of the United Cerebral Palsy Association of Nassau County, Inc. (hereinafter UCPA).

Charles had been institutionalized his whole life and, from 1972 until 1981, resided at the Suffolk Developmental Center. In an effort to control his increasingly severe episodes of self-abusive behavior, in 1978 his primary physician at the facility, Dr. Andrezeg F. Zurek, began administering Haldol to him. Dr. Zurek viewed Haldol as the "drug of choice" in eliminating such behavior. The drug was initially administered in low dosages, which were gradually increased in small increments, during which time Charles was carefully monitored for any signs of Haldol-related side effects. Over the course of the following 13 months, the dosage was gradually reduced again to that of four milligrams per day, considered optimal by the doctor inasmuch as the likelihood of side effects was low and Charles's severe self-injurious behavior was contained.

Charles was maintained on this dosage of Haldol for the next two years under Dr. Zurek's care, during which time his behavior improved dramatically: he participated in various recreational group activities, was independent in many aspects of daily living, and was fully ambulatory. In Dr. Zurek's opinion, Haldol maintenance was "the greatest thing" that ever happened to Charles.

Charles's impressive improvement did not go unnoticed by those in the mental health community close to him. He was selected to participate in a new home environment instituted by UCPA known as an intermediate care facility, the purpose of which is to establish a family like setting where residents can enjoy community resources in an effort to allow them to maximize their potential.

The transfer was effected in March 1981 at which time Charles came under the care of the defendant Dr. Simon, the attending physician at the UCPA facility. Dr. Simon continued Charles's medication of four milligrams of Haldol daily for the next 16 months. Charles adjusted well to his new environment and he steadily improved in his personal and social development, gaining independence in many activities as a result of a behavior modification program instituted by UCPA. He was able to dress, eat and tend to personal hygiene on his own. He was able to converse intelligently in English and Spanish, and he enjoyed many of the recreational activities, including dancing, baseball, kickball and swimming.

Moreover, he attained a level of independence in ambulation as a result of having been taught to walk with a blind man's cane as his guide.

In July 1982 Dr. Simon ordered a change in Charles's medication. Instead of receiving four milligrams of Haldol daily at bedtime, he received two milligrams on an as-needed basis. Thus, the medication would be administered only if Charles became hyperactive or self-abusive. The doctor explained that his decision was prompted by an impending State audit by the Office of Mental Retardation and Developmental Disabilities of all UCPA programs, which was to include a review of each resident's records. The audit would be focusing, in part, on whether those patients on psychotropic medication had been evaluated with a view toward reduction or elimination of medication, a goal expressly made part of UCPA's policy of encouraging freedom from chemical restraints which was consonant with both Federal and State regulations and stemmed from a concern for preventing the adverse effects of medication. Dr. Simon reviewed the plaintiff's UCPA records and concluded that since Charles had been on Haldol for "quite some time" and was "certainly" at risk for tardive dyskinesia, "an irreversible neurological disorder characterized by involuntary, rhythmic and grotesque movements of the face, mouth, tongue, jaws and extremities" (Rivers v Katz, 67 NY2d 485, 490, n 1), one of the most feared of the drug's side effects, of which Charles had as yet manifested no signs, "[h]e certainly deserved a trial at removal".

Within one month of Dr. Simon's reduction and/or elimination of the medication, the plaintiff regressed to his former self-abusive behavior, which was so severe that it was uncontrollable and required hospitalization under Dr. Simon's care. After an unsuccessful two-week trial of various drugs to control Charles's severe self-abuse, Dr. Simon represcribed Haldol in dosages of up to 15 times what they had been during the maintenance period, causing Charles to experience several of the severe side effects of the drug, e.g., Parkinsonian-like stiffness and tremors, lethargy, drowsiness, and an inability to eat, swallow, talk or walk. Charles was maintained on a high dose of Haldol during the next five weeks of his hospitalization, as well as throughout his 11-week posthospitalization stay at the intermediate care facility. During that time, his condition deteriorated, and he was transferred back to the Suffolk Developmental Center.

Upon Charles's return to the Suffolk Developmental Center,

he was confined to a wheelchair, had developed stiffness, tremors and contractures (shortening of the tendons and ligaments) of all four extremities, was barely able to speak, unable to feed himself, and had lost 28 pounds. The immediate neurological and psychiatric evaluations performed confirmed Dr. Zurek's belief that Charles's condition was the result of an "excessive use of Haldol". In a word, he was catatonic.

Dr. Zurek's treatment plan was for a gradual reduction of the Haldol in an attempt to reverse some of the side effects. As the medication was being discontinued and then eliminated, Charles's physical condition improved gradually, though the self-abusive behavior returned, requiring the use of physical restraints. Despite intensive and painful physical therapy, the condition of his legs did not improve. The flexion contractures remain, and are irreversible. Charles is unable to walk and is confined to a wheelchair.

The plaintiff's theory at trial was that Dr. Simon, acting in the scope of his employment with UCPA, was negligent in reducing the Haldol medication, that both Dr. Simon and UCPA departed from accepted standards of medical practice in failing to obtain the informed consent of Charles's mother and guardian, and that these acts proximately caused his injuries. The defendants asserted that Dr. Simon's decision to reduce Charles's medication was within the scope of professional judgment for which no liability can be imposed and that, even if departures from accepted medical practice were demonstrated, no causal connection between the alleged departures and Charles's injuries existed. They asserted that the Haldol played no part in causing the injuries sustained, but that they were the natural sequelae of Charles's abnormal neurological condition which existed from the time of birth and which "got worse for reasons which are not clear".

At the conclusion of the three-week trial, the court, pursuant to CPLR 4111 (b), submitted various special interrogatories which it had formulated to the jury without objection by any party. The jury concluded that "Dr. Simon depart[ed] from accepted medical practices and standards in changing the administration of Haldol from 4 MG [at bedtime] to 2 MG [as needed]", and that this act was both a proximate cause of Charles's injuries and was performed within the scope of Dr. Simon's authority and in furtherance of UCPA's activities, rendering UCPA vicariously liable. The jury rejected the claim asserted against Dr. Simon predicated on lack of informed consent as well as that advanced against UCPA for its

alleged failure to earlier observe and/or report to Dr. Simon changes in Charles's condition after his July 1982 discontinuation of the Haldol. With respect to the remaining interrogatory concerning UCPA's "active" negligence, i.e., "Was defendant [UCPA] negligent in failing to provide Ixia Leal, the mother of Charles Leal, with an opportunity to actively participate in the decision to change the medication Charles Leal was receiving" in accordance with its self-imposed policies and procedures, the jury responded affirmatively. As to the second part of the question, i.e., whether this negligence was a proximate cause of any injury sustained by Charles, the jury marked the box labelled "No", inserted an asterisk, and qualified its response with the handwritten addendum: "The jury feels, however, that there were other acts of negligence on the part of [UCPA] which were proximate causes of injury sustained by Charles Leal". In attributing fault to the defendants, the jury was instructed to do so only with respect to each defendant's affirmative negligence, i.e., not to consider UCPA's vicarious liability, and apportioned fault at 55% to Dr. Simon and 45% to UCPA. The jury awarded the plaintiff $2,000,000 for Charles's pain and suffering and for the permanent effect of the injuries and $500,000 for care and maintenance services.

The inherent inconsistency of the verdict, as it stood, i.e., that, on the questions submitted to it, the jury did not find UCPA to have been independently negligent yet apportioned fault to UCPA for such negligence, was addressed by counsel for the defense, who sought a mistrial, and the plaintiff's attorney, who urged that judgment be entered in his client's favor on the verdict since Dr. Simon was found negligent and UCPA was vicariously liable for his acts. The court ultimately determined to resubmit the interrogatories to the jury for clarification. It instructed the jury to "indicate on paper what [it] had in mind" with respect to the "little asterisk and [the forenoted] comment", over the defendants' objection.

The jury returned with the following note:

"We feel that United Cerebral Palsy was negligent for the following reasons:

"1. failure to provide Dr. Simon with Mr. Leal's complete records as per [UCPA] Policy & Procedures Manual.

"2. failure to provide Dr. Simon with a copy of [UCPA] Policy & Procedures Manual (according to Dr. Simon's testimony, he didn't even know of its existence).

"3. testimony indicated that the intent in the review for purposes of change in resident medication was to satisfy a forthcoming state audit and was <u>not</u> in the best medical interest of the patient" (emphasis in original).

Upon receiving the note, the court announced that the jury's response "obviate[ed] the necessity * * * to take any further action in relation to submission of further interrogatories" and accepted the verdict on the basis that "this is not a new interrogatory of the jury but is a finding of this jury predicated on the evidence adduced and predicated upon my charge. Therefore, everything is now consistent". Judgment was entered accordingly.

Prior to addressing the propriety of the verdict as to UCPA, we find it necessary to discuss the defendant Simon's challenge to the sufficiency of the evidence adduced at trial against him. "A physician's duty is to provide the level of care acceptable in the professional community in which he practices *(Toth v Community Hosp.,* 22 NY2d 255). He is not required to achieve success in every case and cannot be held liable for mere errors of professional judgment *(Pike v Honsinger,* 155 NY 201; *DuBois v Decker,* 130 NY 325). The 'line between medical judgment and deviation from good medical practice is not easy to draw' particularly in cases involving psychiatric treatment *(Topel v Long Is. Jewish Med. Center,* 55 NY2d 682, 684)" *(Schrempf v State of New York,* 66 NY2d 289, 295). When, however, the medical judgment exercised is outside the permissible range, "however good his intentions may have been", a physician will not thereby be rendered free from liability for this "departure from approved methods in general use" *(Pike v Honsinger, supra,* at 210).

The expert medical testimony adduced in the plaintiff's case amply supported the jury's determination of negligence on the part of Dr. Simon. His negligence in changing Charles's medication consisted of a number of deviations from accepted practices, all of which were recognized as such by the medical experts: namely, the failure to familiarize himself with Charles's history, which would have revealed the indispensable nature of Haldol to his continued stability; the failure to secure Charles's complete medical records from the transferring agency; the failure to consult the medical literature and, pursuant to UCPA regulations, the UCPA psychiatrist prior to ordering such change, particularly in view of the doctor's limited experience with the drug and the fact that Charles

had not exhibited any side effects; the failure to wean Charles off the drug gradually so that in the event of the return of the severe self-abusive behavior, the dosage of the drug could be stepped up and any undesirable behavior quickly contained (by contrast, the "cold turkey" approach required the administration of massive doses of the drug); the failure to closely monitor Charles; and, the failure to maintain Charles on an at-bed-time dosage instead of on an as-needed basis while reducing the amount, since Haldol is not effective on an as-needed basis.

The expert testimony elicited established that Dr. Simon's acts were a "substantial factor in producing the resultant injury" *(Monahan v Weichert,* 82 AD2d 102, 106). The physicians testified unequivocally that Dr Simon's "clear" deviation from accepted medical practice in reducing and eliminating Charles's Haldol medication was a proximate cause of the injuries suffered by him inasmuch as the sudden reduction necessitated the subsequent administration of massive doses of Haldol which resulted in complications which in turn led to the development of irreversible leg contractures making it impossible for Charles to walk.

Further, the jury was warranted in rejecting the defense claim that Charles's condition was in no way attributable to the Haldol elimination and readministration but was attributable to the aggravation of a structural brain disturbance which had been with him since birth, for "a plaintiff need not eliminate entirely all possibility that a defendant's conduct was not a cause, but only offer sufficient evidence from which reasonable [persons] may conclude that it is more probable than not that the injury was caused by the defendant" *(Kennedy v Peninsula Hosp. Center,* 135 AD2d 788, 792), which the plaintiff did.

We turn now to the concededly unorthodox manner in which the verdict as to UCPA was rendered. Upon ascertaining that an internal inconsistency in a jury's verdict exists, a trial court is authorized to either declare a mistrial or "require the jury to further consider its answers and verdict" (CPLR 4111 [c]; *Nallan v Helmsley-Spear, Inc.,* 50 NY2d 507, 518, n 5; *see also, Mars Assocs. v New York City Educ. Constr. Fund,* 126 AD2d 178). While the trial court in this case properly endeavored to have the jurors reconcile their initially irreconcilable factual findings inasmuch as it did not appear that they were hopelessly confused so as to warrant the declaration of a mistrial, it did not do so in a manner consis-

tent with the law. Just as where a special finding issued by a jury which has been charged to deliver only a general verdict is regarded as "surplusage" *(Raga v Kresge Co.,* 274 App Div 966; *Carrig v Oakes,* 173 Misc 793), "gratuitous" *(Purpora v Coney Is. Dairy Prods. Corp.,* 262 App Div 908, 909; *McLoughlin v Arlon Motors,* 180 Misc 419, 420-421) and, in short, is accorded no legal effect *(see, Farber v Demino,* 254 NY 363; *Hatch v Attrill,* 118 NY 383, 388; *Croker Natl. Fire Prevention Eng'g Co. v Success Theatre Corp.,* 127 Misc 44), so, too, should a jury finding beyond the ambit of or deviating from the questions propounded to it be considered a legal nullity *(cf., Pogo Holding Corp. v New York Prop. Ins. Underwriting Assn.,* 97 AD2d 503, *affd* 62 NY2d 969). It is clear that the charge of the trial court, insofar as it is not excepted to, becomes the "law of the case" *(see, Brown v Du Frey,* 1 NY2d 190, 195; *Leonard v Home Owners' Loan Corp.,* 297 NY 103, 104) and the jury is bound to render its verdict in the form prescribed by the court. It was, therefore, incumbent on the trial court to direct the jury to reconsider its findings and to return with a special verdict responsive to those interrogatories posed by the court. In the absence of such action, the verdict finding UCPA to have been actively negligent cannot be sustained, and the apportionment of fault between the two defendants must be set aside *(see, Kavanaugh v Nussbaum,* 71 NY2d 535, 550).

This determination is, however, "without practical significance to [the plaintiff but] may [merely] affect defendants' obligations as between each other" *(Kavanaugh v Nussbaum, supra,* at 550; *see, Ravo v Rogatnick,* 70 NY2d 305, 312-313) since UCPA is nevertheless vicariously liable for Dr. Simon's affirmative acts of negligence and therefore UCPA and Dr. Simon are each jointly and severally liable for the full amount of the verdict, which the plaintiff may recover from either defendant *(see, Kelly v Long Is. Light. Co.,* 31 NY2d 25, 30; *County of Westchester v Becket Assocs.,* 102 AD2d 34, 48-49, *affd* 66 NY2d 642). We note that inasmuch as no cross claims for indemnification or contribution have been asserted by the defendants as against one another, we do not remit the matter for a new apportionment of fault between them.

■ With regard to damages, the verdict was excessive to the extent indicated.

We have examined the defendants' remaining contentions and find them to be without merit.

Accordingly, the judgment is reversed, on the law and the facts and as an exercise of discretion, so much of the verdict as apportioned 55% of the fault to Dr. Sheldon Simon and 45% of the fault to the United Cerebral Palsy Association of Nassau County, Inc., is set aside, and a new trial is granted on the issue of damages only, unless within 20 days after service upon the plaintiff of copy of this decision and order, with notice of entry, the plaintiff shall serve and file in the office of the Clerk of the Supreme Court, Nassau County, a written stipulation consenting to reduce the verdict as to damages to the principal sum of $1,100,000 ($1,000,000 for pain and suffering and $100,000 for future care and maintenance services) and to the entry of an amended judgment accordingly. In the event the plaintiff so stipulates, then the judgment, as so reduced and amended, is modified, on the law, by setting aside so much of the verdict as apportioned 55% of the fault to Dr. Sheldon Simon and 45% of the fault to the United Cerebral Palsy Association of Nassau County, Inc., and as so modified, the judgment, as so reduced and amended, is affirmed, without costs or disbursements.

LAWRENCE, J. P., SPATT and SULLIVAN, JJ., concur.

Ordered that the judgment is reversed, on the law and the facts and as an exercise of discretion, so much of the verdict as apportioned 55% of the fault to Dr. Sheldon Simon and 45% of the fault to the United Cerebral Palsy Association of Nassau County, Inc., is set aside, and a new trial is granted on the issue of damages only, unless within 20 days after service upon the plaintiff of copy of this decision and order, with notice of entry, the plaintiff shall serve and file in the office of the Clerk of the Supreme Court, Nassau County, a written stipulation consenting to reduce the verdict as to damages to the principal sum of $1,100,000 ($1,000,000 for pain and suffering and $100,000 for future care and maintenance services) and to the entry of an amended judgment accordingly. In the event the plaintiff so stipulates, then the judgment, as so reduced and amended, is modified, on the law, by setting aside so much of the verdict as apportioned 55% of the fault to Dr. Sheldon Simon and 45% of the fault to the United Cerebral Palsy Association of Nassau County, Inc., and as so modified, the judgment, as so reduced and amended, is affirmed, without costs or disbursements.