■ GERALD KENNEDY, Appellant, v PENINSULA HOSPITAL CENTER, Defendant, and STANLEY BLEIFER et al., Respondents. —In an action to recover damages for medical malpractice, the plaintiff appeals from so much of a judgment of the Supreme Court, Queens County (Le Vine, J.), entered December 20, 1984, as granted the motion of the defendants Bleifer and Feldman for judgment as a matter of law following the conclusion of the plaintiff's case and dismissed the complaint as against those defendants for failure to make out a prima facie case.

Ordered that the judgment is reversed insofar as appealed from, on the law, the motion is denied, and a new trial is granted to the plaintiff against the respondents, with costs to abide the event.

On July 13, 1975, the plaintiff, who was then 12 years old, sustained an injury to his left knee while sliding into a catcher at home plate during the course of a Little League baseball game. He sought treatment at the defendant Peninsula hospital some three days later, complaining of increasing pain, swelling and immobility. X rays taken at the hospital revealed no fractures. An Ace bandage was applied to the injured knee and the plaintiff was advised to take aspirin for the pain and to apply ice compresses. The plaintiff's condition continued to worsen whereupon he consulted his family physician on July 21. At that time, the knee was already swollen and hot to the touch. The plaintiff was immediately referred to the defendant orthopedists, Drs. Bleifer and Feldman.

Dr. Bleifer examined the plaintiff and took another set of X rays which revealed soft tissue swelling on the left knee. He admittedly failed to consider the possibility of osteomyelitis. Dr. Bleifer's examination of the plaintiff revealed an inability to lift his leg from the examining table or to extend his knee from the bent position. At the time of his admission to the hospital on July 21, the plaintiff had no fever but was experiencing pain and an inability to walk. He was initially treated with bed rest, traction and ice bags. After examining the afflicted area under anesthesia on July 25, Dr. Bleifer con-

cluded that the plaintiff had sustained a sprain and contusion to the left knee. A closed cylindrical cast was then applied.

During his stay at the hospital, the plaintiff developed a fever, which Dr. Bleifer attributed to swelling and trauma around the knee. A urinalysis revealed the presence of moderate bacteria, suggesting a possible infection. The plaintiff was discharged from the hospital on July 30 by both his family doctor and Dr. Bleifer although he still had a temperature of 99 degrees. He was advised to continue taking an antibiotic which had been prescribed for him.

After his discharge from the hospital, the plaintiff's condition worsened. His temperature had risen to 102 degrees, the pain from his left leg was extreme and he was in a state of delirium. He was readmitted to the hospital on August 2 with a provisional diagnosis of "fever complicating knee injury". On August 11, the plaintiff was examined by the defendant Dr. Feldman, who directed that the cast be removed and the knee examined for possible osteomyelitis. X rays confirmed that the plaintiff was suffering from this illness. A proper course of treatment involving the administration of intravenous oxacillin and leg traction was thereafter commenced. Although the condition was cured after approximately four weeks of intravenous antibiotic therapy, this had no effect on the damage already done by the osteomyelitis.

The plaintiff continued to be seen by the defendant doctors on an intermittent basis. His last office visit was on November 18, 1975. Medical records of that visit revealed an improvement of the left knee with no evidence of effusion or tenderness and a full range of motion. In December 1975, the plaintiff consulted Dr. Leon Root and thereafter continued to be treated by him.

In 1977 this action was commenced on behalf of the then infant plaintiff* in which it was alleged that he had sustained severe and serious personal injuries and mental anguish as a result of the defendants' negligent medical treatment of him. The particulars included claims that the failure of the defendant doctors to promptly diagnose the osteomyelitic conditions, which most frequently afflicts young males between the ages of 5 and 14, and to treat the patient with massive, aggressive antibiotic therapy even before the diagnosis of osteomyelitis was definitely established resulted in permanent atrophy of the left thigh and calf, deformity, weakness and

---

* The caption of the action has since been amended to reflect the fact that Gerald Kennedy has attained his majority.

persistent pain in the left knee and a consequent limitation of the plaintiff's mobility and activities. Due to the damage caused by the osteomyelitis, it was necessary for the infant plaintiff to undergo surgery and a plan of treatment involving a proximal realignment of the left patella at the Hospital for Special Surgery in 1978. It was further alleged that the plaintiff has already begun to develop chronic osteomyelitis "which will debilitate and deform him and ultimately appreciably shorten his life expectancy as well as necessitating extensive future hospitalizations, operations and medical treatment". It was also claimed that "[a]s a result of the negligence of these defendants and the osteomyelitis contracted thereby, the * * * plaintiff will, in all likelihood, develop arthritis and cancer".

The plaintiff asserted a claim for future lost earnings from his unrealized occupation as a jockey and horse trainer.

After the lengthy presentation of testimony by the plaintiff, the court granted the defendant hospital's motion for a trial order of dismissal. By stipulation of counsel, all cross claims against the hospital were withdrawn. The defendant doctors thereupon moved to dismiss the complaint against them on the ground of the plaintiff's failure to establish a prima facie case. The trial court interjected itself at this point and admitted that it had been "anguishing over this, certainly for the last couple of days". After dismissing the action as against Dr. Feldman, the court then directed the plaintiff's counsel to cull from the trial record a definitive statement by an expert to the effect that the delay of approximately three weeks between the initial examination of the plaintiff by Dr. Bleifer and the proper diagnosis by Dr. Feldman was the proximate cause of the plaintiff's debilitated condition. Upon counsel's inability to produce such a statement to the satisfaction of the court, a request was made on the plaintiff's behalf to reopen the case so as to allow Dr. Root, the plaintiff's medical expert, to respond directly to the court's query. After denying said request, the trial court, with "extreme reluctance", granted the motion to dismiss at the end of the plaintiff's case with respect to Dr. Bleifer as well.

While we agree with the finding of the trial court to the extent that the plaintiff, on this record, failed to set forth a prima facie case against the defendant doctors, we are of the view that the trial court erred in not permitting the plaintiff to reopen his case. It is beyond cavil that trial courts have the power to permit a litigant to reopen his case under appropriate circumstances *(see, Feldsberg v Nitschke,* 49 NY2d 636,

643, 644, *rearg denied* 50 NY2d 1059; *Chimenti v Hertz Corp.,* 23 AD2d 495). "Notwithstanding the general rule that a party holding the affirmative is bound to introduce all the evidence on his side before he closes, the trial court in the exercise of its discretion and for sufficient reason may allow a departure from the rule and permit a party to reopen and supply defects in the evidence which have inadvertently occurred. The order of proof may be varied as occasion requires, being a matter resting in the discretion of the trial court" *(Seguin v Berg,* 260 App Div 284, 286).

Significantly, there is no likelihood in the situation at bar that the defendant doctors, who had not yet commenced their case, would have suffered any prejudice by a brief delay in the proceedings sufficient to allow the plaintiff to resummon one or more of his expert witnesses in order to present curative proof. Unlike the situation in *Oregon Leopold Day Care Center Assn. v Di Marco Constructors Corp.* (104 AD2d 719), where the court was found to have properly denied the plaintiff's motion to reopen the case based in part on its failure to have identified either the witness or the curative proof which said witness would supply, neither the plaintiff's intention in reopening the case nor the substance of what his curative proof would be was any mystery in light of the events which preceded the plaintiff's request.

In view of the substantial time and effort expended on this trial, the court should have exercised its power to do substantial justice by permitting the plaintiff to reopen his case, thus affording him an opportunity to adduce testimony which the court found lacking and thereby insuring his right to have his case adjudicated on the merits. Under the circumstances, the trial court erred in dismissing the complaint as against the defendant doctors at the conclusion of the plaintiff's case and the matter must be remitted for a new trial.

Inasmuch as the plaintiff is being afforded an opportunity to remedy the perceived inadequacy of his case, we will, at this juncture, comment upon the merits such that upon retrial, the trial court may have the benefit of this court's assessment of the evidence. Stated succinctly, the plaintiff's case was devoid of the expert medical testimony necessary to support his claim that the defendant Bleifer's failure to promptly diagnose and treat the osteomyelitic condition was a proximate cause of his injuries, i.e., that the defendant's negligence was a substantial factor in producing the resultant injury *(see, Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 315, *rearg denied* 52 NY2d 829; *Mortensen v Memorial Hosp.,* 105 AD2d 151).

To establish a prima facie case, a plaintiff need not eliminate entirely all possibility that a defendant's conduct was not a cause, but only offer sufficient evidence from which reasonable men may conclude that it is more probable than not that the injury was caused by the defendant *(Monahan v Weichert,* 82 AD2d 102, 108; Restatement [Second] of Torts § 432 [2]; § 433 B, comment b). However, " 'where an [injury] is one which might naturally occur from causes other than a defendant's negligence the inference of his negligence is not fair and reasonable' " *(Mortensen v Memorial Hosp., supra,* at 158, quoting from *Cole v Swagler,* 308 NY 325, 331).

While Dr. Root did testify that the plaintiff was "harmed" by the delay in treatment of the osteomyelitis, the record is barren of any expert testimony to the effect that such a delay was a substantial factor in causing the plaintiff's injuries. This deficiency of proof is all the more significant in light of the testimony of both Dr. Root and Dr. Yoslow that even a promptly cured case of osteomyelitis leaves certain residual damage.

In order to enable the jury to perform the complex task of distinguishing the effect of two independent forces and determining whether the osteomyelitic changes in the plaintiff's patella were caused by the alleged delay in treatment or were the natural concomitants of the disease, it was incumbent upon the plaintiff to adduce competent medical proof to establish proximate cause and, thus, to make out a prima facie case of medical malpractice *(see, Hunter v Szabo,* 117 AD2d 778; *Macey v Hassam,* 97 AD2d 919; *Monahan v Weichert, supra).* This he failed to do, and in the event that he fares no better in the presentation of his case upon the retrial, the complaint will be subject to dismissal. Bracken, J. P., Niehoff, Weinstein and Harwood, JJ., concur.