[927 NYS2d 34]

JANITH KING, as Administrator of the Estate of THORRIE MUR-
RAY, Deceased, Appellant, v ST. BARNABAS HOSPITAL et al.,
Respondents.

First Department, June 30, 2011

## APPEARANCES OF COUNSEL

*Ephrem J. Wertenteil*, New York City, for appellant.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Fay Ng* and *Pamela Seider Dolgow* of counsel), for respondents.

## OPINION OF THE COURT

MANZANET-DANIELS, J.

In this case, involving allegedly negligent resuscitation efforts by a team of first responders, we revisit the vexing question of the degree of certainty necessary to establish legal or proximate cause in a medical malpractice action.

By definition, victims requiring resuscitation are found in grave condition from which the likelihood of recovery may be negligible. These circumstances, however, cannot excuse first responders from all responsibility when they fail to abide by professional standards. Negligent resuscitation attempts—while not a but-for cause of the victim's distress—may nonetheless contribute to a death so as to make the imposition of liability appropriate.

On February 3, 1999, 38-year-old Thorrie Murray, a correction officer at Rikers Island, was off duty and playing a basketball game at the correctional facility's gym when he suffered cardiac arrest and collapsed during the game. Medical assistance was summoned at approximately 6:25 P.M.

Medical personnel from the Rikers Medical Clinic arrived on the scene at 6:32 P.M. The clinic's medical staff consisted of employees from defendant St. Barnabas Hospital, which was under contract with defendant New York City Health and Hospitals Corporation (HHC) to provide medical services to Rikers Island. Defendant City of New York operated and controlled the Rikers Island correctional facility, and oversaw (along with HHC) the performance of Rikers Medical Clinic.

Daniel Ashitey, a licensed physician's assistant,[1] and Kevin Lewis, a registered nurse, were the first responders. Ashitey testified that when they arrived on the scene, at 6:32 P.M., Murray was nonresponsive, not breathing, and unconscious with dilated pupils. Lewis and Ashitey immediately commenced cardiopulminary resuscitation. Ashitey used the "quick look" function on the defibrillator to ascertain whether there was any electrical activity in the heart. At deposition, Ashitey testified that he saw some activity on the cardiac monitor that "looked like a mixture of asystole and some V-fib [ventricular fibrillation]." However, the contemporaneous reports of Ashitey and Lewis stated that the quick paddle check showed Murray to be in an asystolic condition, that is, a "flat line" indicative of no electrical activity. The record evidence showed that defibrillation is not indicated for a patient in an asystolic state and that shocking a patient in asystole could in fact be detrimental to the heart muscle.

Ashitey shocked Murray with the defibrillator paddles at 200 joules in an attempt to restore Murray's heartbeat. Ashitey testified that he checked Murray's heart rhythm again, "confirm[ed]" that he was in an asystolic condition, and accordingly, discontinued defibrillation.

When asked whether starting an IV was an appropriate measure for a person in cardiac arrest, Ashitey responded, "Generally yes." However, no IV was started at that time. Ashitey also agreed that intubation is generally indicated for patients in cardiac arrest.

In a statement Ashitey made on the date of the occurrence, he wrote that after starting CPR, he did "[a] quick paddle check . . . with the defibrillator. Patient was found to be in asystole. Patient defibrillated at 200 joules, no response." Ashitey acknowledged that defibrillation would not be indicated for a patient in asystole.

Kevin Lewis described Murray as gray, "ashen," not breathing, with no pulse. Lewis testified that he initiated CPR and administered oxygen via Ambu bag. The first responders carried a bag containing IV start equipment, medications including epinephrine and atropine, and intubation equipment such as a laryngoscope and guide wires. Lewis recalled that Murray was defibrillated once, without success, during the emergency re-

1. As a physician's assistant, Ashitey was qualified to start an IV, administer medications, defibrillate and intubate, if necessary.

sponse. Lewis testified that as a nurse trained in basic life support he lacked the authority to decide when a defibrillator would be used.[2] Lewis agreed that IV access was generally indicated for a patient in cardiac arrest, and agreed that intubation was the "optimal method" for securing airway access in the patient.

CPR was continued until the arrival at approximately 6:38 P.M. of Dr. Jean-Louis and two nurses from the Rikers Medical Clinic. The defibrillator monitor indicated that Murray was in an asystolic state. Dr. Jean-Louis was not advised by Ashitey or Lewis that there had been an attempt to defibrillate Murray.

Dr. Jean-Louis and the nurses set up an IV and administered three doses of epinephrine. Dr. Jean-Louis testified that he did not know why Ashitey and Lewis had not earlier established IV access. Dr. Jean-Louis attempted, but was unable to intubate Murray. Dr. Jean-Louis acknowledged that it was generally acceptable practice to intubate a patient in an asystolic state. He estimated that only 30% to 35% of oxygen reaches the patient's lungs via Ambu bag, whereas 100% of oxygen reaches the lungs of a patient who is intubated. CPR continued.

Upon the arrival of EMS, at 6:50 P.M., Murray was successfully intubated. Atropine was administered at regular intervals, with no response. EMS did a "quick look" with the defibrillator paddles and noted an asystolic condition. Dr. Jean-Louis, in his written statement, recorded that EMS thereafter attempted to defibrillate Murray three times without success. Dr. Jean-Louis, like Ashitey, acknowledged that defibrillation was not indicated for a patient in an asystolic state and could in fact be detrimental to the heart muscle, eliminating the possibility of the patient recovering a heart rhythm. Murray remained unresponsive and was pronounced dead at 7:16 P.M.

In February 2001, Murray's estate commenced this action for medical malpractice and wrongful death against St. Barnabas Hospital, HHC and the City. The estate alleged that the defendants deviated from accepted medical practice in failing to properly assess decedent's heart function (i.e., defibrillating Murray although he was in asystole), and in failing to properly and timely institute advanced cardiac life support procedures including the administration of epinephrine and atropine.

In February 2009, defendants moved for summary judgment dismissing the complaint, arguing that the opinion of their medi-

---

2. Lewis testified, however, that he had received a certification in advanced life support. He also had experience working as an emergency room nurse. As a registered nurse, he was trained to start an IV.

cal expert established that the emergency medical treatment rendered to Murray was within accepted medical standards, and, in any event, had not contributed to his death.

Defendants relied on the expert affirmation of Dr. Mark Henry, a board-certified emergency physician and the Chairman of the Emergency Medicine Department at Stony Brook University Medical Center. Dr. Henry opined, with a reasonable degree of medical certainty, that the emergency medical treatment rendered to Murray by defendants did not depart from accepted practice, and did not contribute to Murray's death. Dr. Henry noted that when the first responders arrived on the scene, they found Murray to be in an asystolic state. He noted that "asystole is an ominous finding in victims of cardiac arrest in which the heart stops beating and is characterized by the absence of electrical and mechanical activity in the heart," and opined that the possibility of survival from such a state "is extremely rare, especially in the absence of immediate bystander CPR."

Dr. Henry opined that the decision by Ashitey to defibrillate was appropriate under the circumstances since "it was determined that the cardiac rhythm suggested possible ventricular fibrillation." He opined that shocking the patient was appropriate under these circumstances and had no detrimental effect on Murray's outcome.

Dr. Henry concluded:

> "It is my further opinion, to a reasonable degree of medical certainty, that the decedent suffered a sudden cardiac death and nothing more could have been done after the medical staff arrived at the gym to resuscitate decedent. As such, nothing that the Rikers Island medical staff did or did not do contributed to the death of this patient."

The estate opposed the motion, arguing that defendants had not established prima facie entitlement to summary judgment and, assuming they had, that the opinion of the estate's medical expert established the existence of triable issues of fact as to whether defendants departed from accepted medical practice and whether those departures were substantial factors in bringing about Murray's death.

Plaintiff's expert, a board-certified emergency physician, opined, to a reasonable degree of medical certainty, that defendants departed from accepted practice by failing to timely

administer advanced life support medications and by the inappropriate administration of electrical defibrillation to an asystolic rhythm.

Plaintiff's expert explained that CPR and emergency critical care proceed from the presumption that the brain may still be viable even after the heart has stopped, and thus, "the accepted medical standards assume[ ] that when the possibility exists that the brain is viable, absent some compelling medical or legal reason to act otherwise, resuscitation should be initiated."

Plaintiff's expert opined that defibrillating a patient in an asystolic state must be avoided "because doing so removes any chance the patient has of obtaining normal rhythm." He explained that obtaining intravenous access is essential because pharmacological therapy is rapidly needed, and that securing the patient's airway and administering oxygen is "vital" to avoid hypoxemia.

Plaintiff's expert opined that accepted practice, as reflected in guidelines such as those promulgated by the American Heart Association, required that emergency responders presented with an asystolic patient must confirm the absence of a heart rhythm in at least two lead configurations. If confirmed, CPR should be continued and supplemental oxygen administered. The patient should be intubated, and a large-bore peripheral IV inserted to permit the administration of epinephrine, with an initial dose of one milligram and repeated at least every three to five minutes, as well as the administration of atropine, beginning at a one-milligram dose, at least every three to five minutes until maximum dose is achieved.

Plaintiff's expert opined that the failure to obtain IV access and to administer epinephrine for 6 to 10 minutes after Lewis and Ashitey arrived, and the failure to administer atropine until after EMS arrived, a delay of 15 to 18 minutes, constituted departures from accepted medical practice. Plaintiff's expert noted that as a registered nurse and physician's assistant, both Lewis and Ashitey were qualified to start intravenous lines and to administer medication.

Plaintiff's expert opined that electrical defibrillation is not indicated for a patient in asystole, and that defibrillating a patient in an asystolic state can significantly harm the heart muscle and "eliminate any chance of recovery for the patient." Plaintiff's expert opined that assuming Murray was asystole, as described by defendants' witnesses in their testimony and statements, defibrillating Murray constituted a deviation from accepted medical practice.

Plaintiff's expert opined that these departures were substantial factors in bringing about Murray's death. Plaintiff's expert noted that epinephrine, an endogenous catecholamine with both alpha- and beta-adrenergic activity, produces a "favorable redistribution of blood flow during CPR and improves coronary and cerebral perfusion pressure," and that atropine, a parasympatholytic drug that enhances both sinus node automaticity and atrioventricular conduction, "acts to restore normal AV nodal conduction and initiate electrical activity." Plaintiff's expert opined that the delay in administering epinephrine and atropine contributed to Murray's failed resuscitation and death and diminished his chances of survival.

Plaintiff's expert opined that defibrillating a patient in asystole will result in further ischemic damage and decrease the chances of a successful resuscitation.

The court granted defendants' motion for summary judgment dismissing the complaint.[3]

The court found that defendants' proof established, prima facie, that the first responders did not depart from accepted practice in their treatment of Murray. The court noted that upon their "timely" arrival on the scene, Murray was "already unresponsive," and that

> "[a]ll appropriate life saving measures were undertaken in an effort to revive [Murray] including the initiation of CPR. Appropriate and indicated medications were administered in a timely fashion and repeated without any apparent response. The decedent was found in asystole and although there was evidence to suggest possible ventricular fibrillation on the cardiac monitor, defibrillating the patient had no detrimental effect on the outcome."

The court "rejected" the opinion of the estate's expert, noting that even under "the best circumstances, plaintiff's expert cannot predict whether Officer Murray could have been saved or if cardiac function could have been restored." The court noted that the expert had failed to offer any statistics or studies

---

**3.** The court rejected defendants' argument that the emergency medical responders should be afforded the protections of the "Good Samaritan" statute, reasoning that it could not be said that the first responders, who worked for the Rikers Medical Clinic, voluntarily and without expectation of compensation had rendered first aid to decedent. The parties do not take issue with this aspect of the motion court's ruling and we accordingly do not address it on the appeal.

concerning the survival rates of patients in an asystolic state, or whether the administration of epinephrine or atropine during cardiac arrest increases the patient's chances of survival.

We disagree with the result reached by the motion court, and now reverse. On a motion for summary judgment in a medical malpractice action, the defendant doctor has the initial burden of establishing the absence of any deviation or departure from accepted medical practice, or that any such departure was not a proximate cause of the injury or damage alleged. Proximate cause is established where the defendant's conduct was a "substantial factor" in bringing about the injury (*Stewart v New York City Health & Hosps. Corp.*, 207 AD2d 703, 704 [1994], *lv denied* 85 NY2d 809 [1995]).

The motion court, in granting defendants' motion for summary judgment, misapprehended the standard for establishing proximate cause. The motion court found that plaintiff failed to raise a triable issue of fact as to whether defendants' departures caused the decedent's death, noting that plaintiff's expert had failed to offer statistics concerning the survival rates of patients in an asystolic state, and could not predict whether Murray would have been saved. This Court, however, has cautioned that "proximate cause is a legal concept which cannot be dissected and measured in terms of percentages," and that it "has proven to be an elusive [concept], incapable of being precisely defined to cover all situations" (*Mortensen v Memorial Hosp.*, 105 AD2d 151, 157 [1984] [internal quotation marks and citation omitted]; *see Goldberg v Horowitz*, 73 AD3d 691, 694 [2d Dept 2010] ["proximate cause may be found legally sufficient even if (the plaintiff's) expert is unable to quantify the extent to which the defendant's act or omission decreased the plaintiff's chance of a better outcome or increased the injury"]).

The evidence in this case supports the inference that by shocking decedent when he was in an asystolic condition and by failing to timely administer the appropriate cardiac medications, defendants diminished decedent's chances of recovery and may have further damaged decedent's heart.

> "If the proof is ambivalent as to the question of whether the deceased would have died regardless of the malpractice, a pure factual issue is raised . . . and such an issue can only be resolved by a jury determination of whether the malpractice proximately deprived the deceased of that substantial possibility" (*Mortensen*, 105 AD2d at 157).

The motion court was of the view that decedent, found in a life-threatening, nonresponsive state, was in some sense destined to die, and therefore, that any departures from the resuscitation protocols by the first responders were of no import. However, we cannot endorse a rule that would essentially absolve first responders of liability where they deviate from life support protocols. The very fact that advanced life support protocols exist for patients in an asystolic state means that adherence to the protocols affords a chance of reviving the patient, notwithstanding the grave nature of the condition. It necessarily follows that failure to follow the protocols reduces the chances for reviving the patient.

New York courts have implicitly recognized liability premised on negligent resuscitation efforts (see e.g. Lazzaro v County of Nassau, 245 AD2d 342 [1997]), and the theory is recognized in other states (see e.g. IHS Acquisition No. 131, Inc. v Crowson, — SW3d —, 2010 WL 636964, 2010 Tex App LEXIS 1274 [Ct App 2010]; Wax v Tenet Health Sys. Hosps., Inc., 955 So 2d 1 [Fla 2007]), an acknowledgment that under certain circumstances the negligent actions of medical personnel called upon to render life support may depart from the protocols to such a degree that those actions may be said to have contributed to a decedent's death by the elimination or deprivation of any possibility of survival.[4]

In this case, defendants failed to meet their prima facie burden of establishing either the absence of a departure or lack of causation. Dr. Henry's opinion that Lewis and Ashitey did not deviate from acceptable medical practice was based on an assumption that the decedent was in ventricular fibrillation when he was shocked by Ashitey. However, the documentary evidence on the motion, including Lewis's and Ashitey's contemporaneous reports of the incident and Lewis's deposition testimony, showed that decedent was in an asystolic condition. The only "evidence" that decedent was other than asystolic was Ashitey's testimony, eight years after the incident—and contrary to his initial report—that he observed a "mixture of asystole and some V-fib." It remains undisputed that defibrillation is contraindicated, and in fact detrimental, for a patient in an asystolic condition—a proposition Dr. Henry did not even purport to refute.

---

4. These actions bear some similarity to the "wrongful suicide" cases, in which we have found that imposition of liability upon psychiatric personnel may be appropriate under certain circumstances for failing to prevent a suicide.

Moreover, defendants' expert failed to even address the other departures alleged, namely, that defendants deviated from accepted medical practice in not administering epinephrine for as long as 10 minutes and atropine for 18 minutes.

We find, in any event, that plaintiff's expert has adequately raised a triable issue of fact as to whether defendants departed from accepted practice in their resuscitation attempts. Both plaintiff's expert and Dr. Jean-Louis testified that defibrillating a patient in an asystolic condition damages the heart muscle, thereby diminishing the chances of survival. The failure to promptly set up an IV and to administer epinephrine and atropine, as per resuscitation protocols, also diminished the chance of survival. Plaintiff established a delay on the order of 6 to 10 minutes in administering epinephrine and 18 minutes in administering atropine, which defendants do not dispute.

Accordingly, the order of the Supreme Court, Bronx County (Douglas E. McKeon, J.), entered August 4, 2009, which granted defendants' motion for summary judgment dismissing the complaint, should be reversed, on the law, without costs, and the motion denied.

Tom, J.P., Sweeny, Catterson and Acosta, JJ., concur.

Order, Supreme Court, Bronx County, entered August 4, 2009, reversed, on the law, without costs, and the motion denied.