Goldstein v Berenbaum (2025 NY Slip Op 04216)

Goldstein v Berenbaum

2025 NY Slip Op 04216

Decided on July 17, 2025

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: July 17, 2025

Before: Moulton, J.P., González, Scarpulla, Higgitt, Michael, JJ.

Index No. 805291/18|Appeal No. 4074|Case No. 2024-01458|

[*1]Jeffrey Goldstein et al., Plaintiffs-Respondents,
v
Rachel Marie Berenbaum et al., Defendants-Appellants, Saadia Akhtar et al., Defendants.

Kaufman Borgeest & Ryan LLP, Valhalla (Jacqueline Mandell of counsel), for appellants.
Morelli Law Firm, PLLC, New York (Sara A. Mahoney of counsel), for respondents.

Order, Supreme Court, New York County (Kathy J. King, J.), entered February 28, 2024, which denied the motion of defendants Rachel Marie Berenbaum, D.C. and Manhattan Sports Therapy for summary judgment dismissing the complaint as against them, unanimously affirmed, without costs.
In this chiropractic malpractice action, plaintiffs allege that defendant Berenbaum's chiropractic treatment of plaintiff Jeffrey Goldstein on four occasions, from November 10, 2017 to November 27, 2017, caused him to suffer bilateral vertebral artery dissections that resulted in strokes on December 2 and 6, 2017.
As an initial matter, defendants' motion was timely made (see CPLR 3212[a]). The September 10, 2020 notice filed by Supreme Court, which was not rescinded and did not expire, superseded the time limits contained in the March 19, 2019 preliminary conference order, thereby enlarging the time for summary judgment motions from 60 to 90 days after the filing of the note of issue; this enlargement of time fortuitously coincided with the part rules in place when the action was reassigned to Justice King in 2022 and when those rules were circulated to the parties on March 21, 2023, at least four months prior to service of the motion (see e.g. Nyadzi v Lee, 129 AD3d 645, 645 [1st Dept 2015]; Donnell v Madison Ave.-53rd St. Corp., 214 AD2d 307, 308 [1st Dept 1995]; compare Waxman v Hallen Constr. Co., Inc., 139 AD3d 597, 598 [1st Dept 2016]).
Defendants met their prima facie burden of demonstrating a lack of causal relationship between Berenbaum's treatment and Goldstein's injuries. In support of the motion, defendants submitted Goldstein's medical records and the affirmations of a neurosurgeon and a neuroradiologist, both of whom opined that the collective evidence, including the radiological studies both before and after Berenbaum's treatment of Goldstein and Goldstein's deposition testimony, demonstrated that Goldstein's injuries were unrelated to Berenbaum's treatment.
The neurosurgeon explained that a dissection ? an accumulation of blood within the wall of a blood vessel ? may be either spontaneous, emanating from a force within the blood vessel due to factors that influence blood flow dynamics, or traumatic, emanating from an external physical force applied to the blood vessel and the adjacent structures. Several factors contributed to his conclusion that the dissections were spontaneous and not traumatically induced by the forces applied to Goldstein's body during Berenbaum's treatment.
The neurosurgeon also opined that neither the "typical diversified chiropractic adjustment technique" nor the "even more conservative modalities such as . . . traction" involved strain sufficient for disruption of or injury to the cervical vessels, and that Berenbaum's treatment, as described by Goldstein at his deposition, even if "aggressive," "jerky," or "fast," was evocative of traction, as opposed to manipulation, and, in any event, could not have involved force sufficient [*2]to cause these types of injuries. He explained further that it is extremely rare for bilateral or multiple dissections to be produced by trauma, with spontaneous injury being more likely to produce them. Moreover, he explained, it is even less likely that the injuries are traumatic when there is no evidence of associated injury to the adjacent and surrounding tissues; it is an "impossibility," because the path of travel of an external force capable of producing a dissection would have damaged the interstitial tissues or structures between the dissections or resulted in the collection of blood. Here, the neurosurgeon noted, none of the posttreatment imaging showed injury to any structure in the neck, other than the dissections themselves, confirming that the dissections were spontaneous and not traumatic.
Defendants' neurosurgeon further opined that two pretreatment imaging studies, the second taken within a month prior to Berenbaum's first treatment of Goldstein, showed that Goldstein was suffering from a preexisting arterial disease impacting his entire vascular system and placing him at high risk for developing spontaneous dissections as the disease progressed and continued to impact blood flow. He opined that this systemic disease process explained the nonresolving neck pain that brought Goldstein to seek Berenbaum's care in the first place, and also explained why Goldstein sustained bilateral rather than unilateral dissection, because both structures would have been similarly affected by disease and stressors.
Finally, the neurosurgeon opined that because traumatic dissections, by definition, produce immediate and severe pain, and because Goldstein did not testify to any forceful impact or pain during or after any of the treatment, the dissections could not have been traumatically induced.
Defendants' neuroradiologist reviewed imaging conducted both before and after Berenbaum's treatment of Goldstein. He found that the pretreatment imaging showed that Goldstein had already sustained an undiagnosed right-sided dissection, and because the posttreatment imaging demonstrated that the condition remained unchanged, Berenbaum's treatment could not have caused or contributed to that dissection. Defendants' neuroradiologist further opined that the characteristics of the left-sided dissection appearing on posttreatment imaging indicated that it had occurred days after plaintiff's last treatment with Berenbaum. He concluded that because a traumatic dissection occurs at the moment of arterial trauma, and not days later, this dissection was not caused by Berenbaum's treatment of plaintiff.[FN1]
Contrary to plaintiffs' argument, a defendant in a chiropractic malpractice action may meet its prima facie burden by demonstrating either that there was no departure from good and accepted chiropractic practice in treating the plaintiff, or that any such departure was not a proximate cause of the plaintiff's injuries (see Lyons v Tsadyk, 225 AD3d 681, 682 [2d Dept [*3]2024]; Scalisi v Oberlander, 96 AD3d 106, 120 [1st Dept 2012]; King v St. Barnabas Hosp., 87 AD3d 238, 245 [1st Dept 2011]). Defendants demonstrated their prima facie entitlement to judgment as a matter of law by establishing the latter.
In opposition, plaintiffs submitted the affirmation of a neurologist who opined, premised on his experience, the collective testimony of Goldstein and Berenbaum describing the mechanism of injury, the medical records purportedly attributing the dissections and strokes to chiropractic care and simultaneously demonstrating the absence of preexisting or other contributing factors or alternate causes, imaging records, peer-reviewed studies, and the temporal proximity of the treatment and the onset of symptomatology, that Berenbaum's treatment was the proximate cause of Goldstein's injuries. Specifically, the neurologist opined that chiropractic treatment uses enough force to cause dissection and that minimal force can cause bilateral dissection. He further opined that given the deposition testimony, the modalities used by Berenbaum on the last date of treatment could cause bilateral dissection, and that she applied sufficient force to proximately cause bilateral dissection.
Plaintiffs' neurologist also cited and referred to peer-reviewed studies indicating, in contrast to the neurosurgeon's opinions, that there was a significant relationship between chiropractic care and dissection, that chiropractic care more often produced bilateral dissections than unilateral, and that dissection was statistically associated with chiropractic treatment occurring as many as 30 days earlier, all suggesting a relationship between Berenbaum's chiropractic treatment of Goldstein and his bilateral dissections.
Finally, plaintiffs' neurologist opined that Goldstein's pretreatment imaging showed nonspecific findings insufficient to support a claim of predisposition, the only alternate cause defendants identified as contributing to the likelihood of spontaneity.
Supreme Court correctly denied defendants' motion on the basis of the experts' conflicting opinions regarding proximate cause. Defendants argue that plaintiffs' neurologist failed to refute various opinions of their neurosurgeon that were critical to defendants' prima facie showing of entitlement to dispositive relief, thus failing to raise an issue of fact. However, viewing the evidence in the light most favorable to plaintiffs as the nonmovants, their proof was sufficient to warrant denial of the motion.
The significance of the collective effect of Goldstein's and Berenbaum's deposition testimony relates to defendants' neurologist's assertions that chiropractic adjustment is to be differentiated from the more gentle modality of traction, that Goldstein's description of the treatment Berenbaum rendered was more akin to traction than to chiropractic adjustment, and that therefore, Berenbaum had not employed sufficient force to cause a dissection. Berenbaum denied that her practice [*4]involved manipulation, but, according to plaintiffs, Goldstein's description of Berenbaum's treatment matched her own notion of manipulation, which she acknowledged, in contradiction to defendants' neurologist, carried a risk of stroke (see Culver v Simko, 170 AD3d 1599, 1600 [4th Dept 2019]).
Further, while defendants argued that plaintiffs' neurologist failed to address their radiological evidence of a lack of vascular abnormality in imaging conducted on December 2 and 5, 2017, their own neuroradiologist, while acknowledging those findings, simultaneously opined that the characteristics of the findings of a December 6, 2017 MRI demonstrated that the "initial vascular event" had to have occurred during a window of time from November 29, 2017 to December 3, 2017. Thus, this raised an issue of fact as to the bearing of the December 5, 2017 imaging on the existence of vascular injury following defendants' treatment of plaintiff.
Plaintiffs raised an issue of fact as to the immediacy of the manifestation of a dissection related to chiropractic care, through the above-mentioned peer-reviewed 30-day study on which their neurologist relied when he opined that the temporality between the treatment, as described by Goldstein and Berenbaum, and the stroke established "a clear correlation" between the two. Immediacy was a characteristic of traumatic dissection that defendants' expert had opined to be immutable, being part of its very "definition." Thus, plaintiffs raised "issues of credibility of expert witnesses and the accuracy of their testimony [that] are matters within the province of the jury" (Griffin v Cerabona, 103 AD3d 420, 421 [1st Dept 2013] [internal quotation marks omitted]).
Contrary to defendants' characterization, this reference to "correlation" did not constitute a resort to mere hindsight reasoning. Plaintiffs' expert did not, as defendants suggest, conclude causation from the mere fact of injury, and temporal proximity between the treatment and dissections was merely one of many factors forming the basis of his opinions (see Hunter v Szabo, 117 AD2d 778, 779 [2d Dept 1986]). It is furthermore apparent that the expert's reference to temporality, supported by his citation to a relevant study, was directly responsive to defendants' assertion of immediacy. Defendants read this paragraph in a vacuum, rather than in its context.
Finally, plaintiffs' experts' opinions that traction and adjustment "could" cause dissection were not impermissibly indefinite. Such language "does not of itself destroy the probative force of the testimony if . . . [the] opinion evidence is fortified by detailed explanation and other facts in the record which add to its reasonableness and probable correctness" (Matter of Miller v National Cabinet Co., 8 NY2d 277, 282-283 [1960] [internal quotation marks omitted]). These opinions arose in the larger context of the expert's opinions that both cervical traction and manipulation, contrary to defendants' neurologist's [*5]opinion, are capable of generating force sufficient to cause dissection and stroke, as mentioned in the studies which he cited as informing his opinions, and that Goldstein's treatment, as described, was indicative of the manipulation that Berenbaum denied performing and knew carried a risk of stroke. An expert must "exhibit[] a degree of confidence in [the] conclusions sufficient to satisfy accepted standards of reliability," a requirement that may be satisfied, as here, "by any formulation from which it can be said that the witness' 'whole opinion' reflects an acceptable level of certainty" (Matott v Ward, 48 NY2d 455, 459-460 [1979]). The overall tenor of plaintiffs' expert's affirmation "conveyed . . . assurance that it was not based on either supposition or speculation" (id. at 463; see 1A NY PJI3d 1:90 at 181 [2025]).
In light of the foregoing, denial of the motion with respect to plaintiffs' informed consent claim was also proper.
We have considered defendants' remaining arguments and find them unavailing.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: July 17, 2025

Footnotes

Footnote 1: Statements from Goldstein's treating physicians that the dissections "seem[ed] to have occurred in the setting of recent chiropractor use" or were "likely due to neck manipulations" were insufficient to undermine defendants' prima facie showing; the physicians did not actually conclude that chiropractic treatment caused Goldstein's injuries, and the same records showed that the dissections were ultimately idiopathic. Likewise, the neurosurgeon's causation opinions were not necessarily inconsistent with Berenbaum's testimony that she was aware of a small risk of stroke from cervical manipulation, and that she was unaware of any such risk associated with the modalities that she performed in her practice. This is true even though traction, one of those modalities, involves applying tension to the neck, which is where the vertebral arteries, part of the vascular system, are located. Berenbaum's testimony was as to vascular involvement, generally, while the neurosurgeon specifically referred to the likelihood of chiropractic treatment causing the type of injury at issue here.