**Hoepelman v New York & Presbyt. Hosp.**

2024 NY Slip Op 33573(U)

October 1, 2024

Sup Ct, NY County

Docket Number: Index No. 805314/2016

Judge: John J. Kelley

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT: **HON. JOHN J. KELLEY**  PART  56M

*Justice*

-----------------------------------------------------------------------------X

CARMEN HOEPELMAN, as Administrator
of the Estate of RAUL NIEVES, JR., Deceased,

                                Plaintiff,

- v -

THE NEW YORK AND PRESBYTERIAN HOSPITAL and
NICHOLAS MORRISSEY, M.D.,

                                Defendants.

-----------------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 805314/2016 |
| MOTION DATE | 07/12/2024 |
| MOTION SEQ. NO. | 002 |

**DECISION + ORDER ON
MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 76

were read on this motion to/for          SUMMARY JUDGMENT (AFTER JOINDER)   .

In this action to recover damages for medical malpractice based on alleged departures from good and accepted practice and lack of informed consent, the defendants move pursuant to CPLR 3212 for summary judgment dismissing the complaint. The plaintiff opposes the motion. The motion is granted to the extent that the defendants are awarded summary judgment dismissing the lack of informed consent cause of action, and any claims of medical malpractice premised upon the alleged improper performance of a March 18, 2014 surgical procedure on the plaintiff's decedent and the failure of emergency department physicians for the defendant The New York and Presbyterian Hospital (NYPH) to order a vascular surgery consultation during the decedent's two post-operative emergency room visits at NYPH on April 2-3, 2014 and April 7-8, 2014. The motion is otherwise denied, since there are triable issues of fact as to whether the NYPH departed from good and accepted medical practice during those emergency visits by virtue of its emergency department physicians' failure to suspect, consider, test for, diagnose, and treat the plaintiff's decedent for ischemia mononeuropathy, also known

805314/2016   **HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK &
PRESBYTERIAN HOSP.**
Motion No. 002

Page 1 of 23

as ischemic monomelic neuropathy (hereinafter IMN), and steal syndrome (retrograde blood flow), and those physicians' failure to order a neurological consultation. There also are triable issues of fact as to whether the defendant vascular surgeon Nicholas Morrissey, M.D., departed from good and accepted practice in failing immediately to intervene on an emergent basis, and thereupon perform necessary surgical procedures after he had diagnosed the decedent with steal syndrome on April 10, 2014. In addition, there are triable issues of fact as to whether those alleged departures caused or contributed to the decedent's injuries.

On August 5, 2016, the plaintiff's decedent commenced this action to recover damages for medical malpractice. On April 27, 2021, after the completion of discovery, the plaintiff served and filed a note of issue and certificate of readiness. On August 27, 2021, the defendants made the instant motion for summary judgment. On October 30, 2021, the decedent died. His attorneys nonetheless submitted opposition to the motion on November 12, 2021, the defendants submitted a reply affirmation on December 2, 2021, and the return date of the motion was scheduled for December 6, 2021. On December 3, 2021, the decedent's counsel informed the court of his death, and the court issued an order on December 10, 2021 memorializing the automatic stay of proceedings imposed by operation of law as of the date of the decedent's death, and holding this motion in abeyance. In a so-ordered stipulation entered January 10, 2024, the court vacated the stay and substituted Carmen Hoepelman, as administrator of the decedent's estate, as the plaintiff in this action.

Inasmuch as the parties respectively served and filed opposition and reply papers subsequent to the decedent's death, but prior to Hoepelman's substitution as plaintiff, those submissions technically were nullities (*see Griffin v Manning*, 36 AD3d 530, 532 [1st Dept 2007]; *Stancu v Cheon Hyang Oh*, 74 AD3d 1322, 1322-1323 [2d Dept 2010]). Nonetheless, the court deems those papers to have been served and filed nunc pro tunc in a timely fashion, that is, subsequent to Hoepelman's substitution as the plaintiff.

**805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK &
PRESBYTERIAN HOSP.
Motion No.  002**

Page 2 of 23

[* 2]

2 of 23

The crux of the plaintiff's claim is that the defendants committed medical malpractice in treating her decedent between March 18, 2014 and April 8, 2014 at NYPH. Specifically, the decedent alleged in his bill of particulars that the defendants, in the course of a March 18, 2014 surgery, negligently placed a surgically created arteriovenous fistula (AVF) in his upper left arm that was intended to provide an appropriate access point for dialysis to treat his end-stage kidney failure. The decedent further contended that, over the course of his treatment, the defendants failed properly to test for, diagnose, and treat him for IMN or steal syndrome, either surgically or otherwise, and, thus, failed to minimize nerve ischemia. He also asserted that, due to the defendants' negligence in providing post-operative care with respect to the procedure, the AVF graft failed to mature, and, that, as a consequence, he sustained IMN, mononeuritis, and steal syndrome, which caused decreased function of his left arm and fingers, pain and abnormal digital waveforms in his upper left arm, and left-side radial pulse weakness. The decedent additionally contended that the failure of the AVF graft required him to undergo four subsequent separate surgeries, the first being an embolization involving the placement of steel coils at the upper arm AVF site, the second involving a ligation of a radiocephalic AVF that had been surgically created several months prior to the brachiocephalic AVF that is the subject of this action, the third involving the revision of the brachiocephalic AVF and concomitant angioplasty, and the fourth involving angioplasty to widen the veins in his arm, as well as additional maintenance procedures thereafter.

In support of their motion, the defendants submitted the pleadings, the bill of particulars, the transcripts of the parties' deposition testimony, relevant hospital and medical records, an attorneys' affirmation, a statement of allegedly undisputed material facts, the plaintiff's expert witness CPLR 3101(d) disclosure statement, and the expert affirmations of vascular surgeon Larry A. Scher, M.D., internist Jonathan A. Winston, M.D., and emergency medicine specialist John P. Marshall, M.D.

**805314/2016  HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP.**
**Motion No. 002**

**Page 3 of 23**

3 of 23

Dr. Scher opined that the defendants did not depart from good and accepted medical practice, that they obtained the decedent's fully informed consent to the AVF procedure, and that nothing that they did or failed to do caused or contributed to any of the injuries now claimed by the plaintiff.

Dr. Scher noted that, in November 2013, the decedent, who was then 41 years old, had been suffering from end-stage renal disease, thus requiring ongoing hemodialysis, which he had been receiving three times per week since at least March 2013 via a catheter that had been placed through his internal jugular vein. Dr. Scher opined that the use of a catheter is not the desired method for administering long-term dialysis, due to its high infection rate. He explained that, on November 18, 2013, Morrissey thus had placed a surgically created radiocephalic AVF in the decedent's left wrist to more safely and efficiently provide an access point with which to administer dialysis to treat his end-stage renal disease. Dr. Scher averred, however, that this AVF had failed to "mature," thus requiring a revision or an alternative site for an AVF.

Dr. Scher opined that, on February 6, 2014, Morrissey obtained a qualitatively sufficient informed consent from the decedent with respect to the proposed surgical creation of a new, brachiocephalic AVF. Dr. Scher concluded that, based on the parties' testimony, Morrissey, both prior to the performance of the November 2013 radiocephalic AVF, and again prior to performing a brachiocephalic AVF placement in the decedent's upper left arm, fully informed the decedent that the risks associated with the new AVF placement included the possibility that the AVF would not mature. Dr. Scher further asserted that Morrissey fully informed the decedent of the possibility that the procedure could cause the onset of steal syndrome, which Dr. Scher defined as the process of blood being metaphorically "stolen," in that blood is shunted away from a patient's arm tissues, thus depriving the arm of adequate blood flow, and causing a loss of range of motion in the hand, as well as pain and numbness in the fingers. He further expressed his opinion that Morrissey fully described possible alternative surgical procedures

805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP.
Motion No. 002

Page 4 of 23

4 of 23

[* 4]

with the decedent, as well as the option of returning to catheter dialysis, along with the risks and benefits of those options.

After the decedent again was admitted to NYPH on March 18, 2014, Morrissey placed a surgically created brachiocephalic AVF in the decedent's left upper arm to provide an access point for dialysis treatment. Based on his review of the operative report, Dr. Scher explained that Morrissey properly made an oblique incision over the cephalic vein in the decedent's upper left arm, and then across the cubital crease toward the brachial artery in the forearm. He concluded that the Morrissey made appropriate dissections and that, prior to the completion of the procedure, he appropriately flushed the inflow artery and outflow vein. In addition, Dr. Scher explained that Morrissey checked the "thrill," that is, the vibration felt in the decedent's skin over the blood flow, which was "noted to be good," and that a retained radial pulse was present. He further asserted that, prior to the closure of the wound, hemostasis was assured, that the decedent tolerated the procedure well, and that the decedent appropriately was transferred to the NYPH post-anesthesia care unit in satisfactory condition.

Although Dr. Scher essentially conceded that the brachiocephalic AVF, much like the radiocephalic AVF, ultimately did not mature, he opined that the choice of the brachiocephalic AVF was medically indicated and proper, that it was commonplace for any surgically created AVF to fail to mature, and that it also was an accepted risk of the AVF placement. As he explained it, access for dialysis treatment through a surgically created AVF that connects the artery and vein allows for the removal and return of blood during dialysis treatment. He asserted that this type of AVF is the preferred method of access, as opposed to a graft or catheter, because an AVF has a lower infection and thrombosis rate than those methods. Dr. Scher asserted that, once matured, AVFs have a longer life-expectancy and fewer complications than grafts or catheters. He opined that, in October 2013 and, thus, prior to both the November 2013 radiocephalic AVF procedure and the March 2014 brachiocephalic AVF procedure, Morrissey properly performed a mapping test that reflected no evidence of venous

**805314/2016  HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP. Motion No. 002**                    **Page 5 of 23**

obstruction in the left upper extremity, normal compressibility of the deep and superficial veins therein, and no evidence of deep or superficial vein thrombosis. Moreover, Dr. Scher explained that Morrissey appropriately conducted an AVF duplex exam on February 6, 2014, and thereupon correctly determined that the radiocephalic AVF had not matured because there was a significant narrowing at the anastomosis, that is, the site of surgical connection.

Dr. Scher explicitly opined that, contrary to the plaintiff's contentions, her decedent never suffered from IMN. He explained that IMN is an immediate post-operative complication, constituting a "flash injury" to the nerves, "occurring almost immediately following the performance of an AVF" procedure. Dr. Scher asserted that, typically, IMN results in a complete loss of function that usually requires immediate ligation within one day of the surgery. He concluded that, inasmuch as the decedent's first reported complaints of pain occurred on April 2, 2014, or 15 days subsequent to the subject surgical procedure, the decedent did not suffer from IMN. In this respect, he noted that records from Riverside Dialysis, where the decedent received his dialysis therapy, reflected that, on two occasions during the two weeks immediately following the procedure, the decedent made no complaints of neurological problems or deficits in his arm or hands. He further noted that the NYPH chart reflected that, at a March 20, 2014 post-operative visit, the decedent was doing well, with no such complaints indicated. Dr. Scher asserted that a delay of over two weeks in the manifestation of symptoms "does not comport with the signs and symptoms of IMN, which would be revealed immediately, postoperatively."

Additionally, although Dr. Scher noted that the decedent presented to NYPH's emergency department on April 2, 2014 and April 7, 2014, the specific complaints of pain that he made on those occasions could not be related to any neurologic deficit, such as pain or numbness in his hand, but instead were referable to pain at the AVF site during his dialysis sessions. According to Dr. Scher,

> "[i]t is possible for dialysis patients to have pain at the fistula site following
> dialysis (even where, as in this case, the access point is not the fistula, but the

**805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK &**          **Page 6 of 23**
**PRESBYTERIAN HOSP.**
**Motion No.  002**

catheter), in addition to cramping, elevated blood pressure and dizziness. Further, the plaintiff's pain level, at its worst on the April 2nd (discharge 3rd) presentation was 9/10, though decreased to 0/10 by the time of discharge after the administration of Morphine and Percocet. The type of pain caused by IMN may be more severe and not likely controlled by the aforementioned methods. Similarly, this is also true for plaintiff's April 7th (discharge on the 8th) presentation relative to his pain complaints. At its worst, the plaintiff's pain was a 6/10 during this presentation, which again decreased to 4/10 and then 0/10 prior to discharge. He was also only provided with Percocet during the second presentation and plaintiff himself indicated to NYPH providers that his pain could be managed at home."

He further pointed out that the pain of which the decedent complained during both of his post-surgical emergency department visits "had an acute (or immediate) onset following dialysis and had started the same day he presented," which he characterized as "further evidence that [decedent] did not have a diagnosis of IMN during either NYPH ED presentation," and that "any allegations to that effect are not medically sound."

Dr. Scher ultimately concluded that the care and treatment rendered to the decedent during his April 2, 2014 and April 7, 2014 emergency room visits, and consequent short-term hospital stays after each visit, constituted "proper and appropriate medical and vascular treatment." In this regard, he opined that that vascular intervention was not required during either presentation, that the appropriate medical testing and imaging were ordered and performed, and that appropriate consultations were ordered. Moreover, Dr. Scher asserted that the decedent was provided with appropriate follow-up directives, including a directive to follow up with Morrissey in connection with appointments that already had been scheduled.

Specifically, Dr. Scher noted that, after conducting a physical examination that had revealed a fistula incision that was clean, dry, and intact, as well as a palpable thrill over the fistula site, with only a slight delay in capillary refill, NYPH's attending physician at the April 2, 2014 visit had reported "acute on chronic exacerbation of left arm pain since the fistula placement that was present with dialysis." According to Dr. Scher, a palpable thrill reflected that the AVF was operating correctly, but that, in light of the recent AVF placement, the attending physician prudently ordered a fistula sonogram and laboratory blood testing, in addition to a

805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK &                    Page 7 of 23
PRESBYTERIAN HOSP.
Motion No. 002

7 of 23

[* 7]

vascular surgery consultation, all of which were performed.  With respect to the vascular surgery consultation, Dr. Scher explained that the consulting vascular surgeon memorialized the fact that the decedent's non-radiating pain had commenced at 5:00 p.m. on April 2, 2014, and was located directly over the AVF site.  The consulting vascular surgeon, however, indicated that the decedent experienced "endorsed" tingling in his left hand, with decreased function in the fingers of that hand, although Dr. Scher asserted that this condition "was not acutely changed and was improving" since the March 18, 2024 surgery.  According to Dr. Scher, the consulting vascular surgeon reported that a physical examination revealed a well-healing left upper extremity AVF, without discharge or redness, but with a palpable thrill and palpable radial and ulnar pulses.  The consulting surgeon reportedly found decreased strength in the decedent's left upper extremity, but normal sensation.  Dr. Scher opined that the consulting vascular surgeon appropriately discussed the case with NYPH's senior resident, and properly concluded that no surgical intervention needed to be recommended at that time.  According to Dr. Scher, the AVF sonogram revealed a patent fistula with good flow and a small post-operative fluid collection, which, in a clinical setting, likely constituted simple fluid after surgery.  He thus agreed that the clinical "picture" was not consistent with infection or abscess, and that the decedent properly was cleared for discharge with a follow-up to the NYPH vascular surgery clinic.

In connection with the decedent's April 7, 2014 emergency department visit, Dr. Scher opined that the pain reported by the decedent remained immediately over the AVF site, and had not acutely changed.  He further asserted that, while the decedent's blood pressure was elevated upon presentation, it had been documented that he did not take his blood pressure medication and had undergone dialysis earlier that day, both of which can elevate blood pressure.  Dr. Scher explained that the NYPH records reflected that the same resident who had examined the decedent five days earlier examined him again, and that the attending physician who also examined the decedent on April 7, 2014 made note of the result of the prior sonogram.  As Dr. Scher reported it, the attending physician's April 8, 2014 examination revealed no

**805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP.**
**Motion No.  002**

**Page 8 of 23**

redness or swelling to the AVF site, some tenderness to palpation over the left anterior forearm, no coldness to the fingers, palpable thrill, good capillary refill, and an extremity strength of 5 on a scale of 5. The examination, as Dr. Scher characterized it, was not suggestive of infection, and while it may have been suggestive of steal syndrome, the decedent already had an appointment scheduled with Morrissey for April 9, 2014. Dr. Scher thus opined that there was no need for immediate intervention to treat any steal syndrome symptoms, in light of the decedent's upcoming appointment with Morrissey and the presence of palpable thrill, the absence of coldness in the decedent's fingers, and good capillary refill. Since Dr. Scher concluded that the decedent evinced no emergent condition, he opined that the NYPH emergency department appropriately discharged him without surgical intervention, and only with a directive to follow up with Morrissey on April 9, 2014.

Dr. Scher asserted that, when the decedent actually next saw Morrissey on April 10, 2014, the latter appropriately performed an Allen Test, which, based on findings of abnormal digital waveforms of the left upper extremity and improvement in the waveforms with AVF compression, confirmed the presence of steal syndrome. He further opined that Morrissey thereafter appropriately and timely recommended that the decedent undergo a banding procedure with an interventional radiologist to treat the steal syndrome, while also offering him other options, including distal revascularization interval ligation (DRIL) to alter AVF blood flow and potentially preserve the AVF. As Dr. Scher described it, the decedent opted for the banding procedure, which he characterized as less invasive than the less-desirable ligation. He noted that, on April 18, 2014, the decedent underwent an embolization procedure of the left brachiocephalic AVF performed by nephrologist and vascular surgeon Sean D. Kalloo, M.D., who, as part of the procedure, implanted coils in the decedent's arm.

As Dr. Scher interpreted the relevant medical records, the decedent thereafter underwent a ligation of the left radiocephalic AVF on May 20, 2014 at American Access Care Bronx, performed by vascular surgeon Amit Shah, M.D., underwent a fistulagram and

**805314/2016  HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP.**
**Motion No. 002**

**Page 9 of 23**

9 of 23

angioplasty at the brachiocephalic AVF site on July 8, 2014 at the same facility, and submitted to another fistulagram and angioplasty there on July 29, 2014, after which the brachiocephalic AVF finally was ready for use. According to his further reading of medical records, Dr. Scher asserted that the decedent underwent maintenance procedures of the brachiocephalic AVF performed by vascular and interventional radiologist Allen J. Wiesenfeld, M.D., among others. As Dr. Scher characterized them, these procedures involved ensuring that the brachiocephalic AVF could be properly utilized during dialysis, would not clot, and would remain patent.

Dr. Scher noted that the decedent did not return to see Morrissey after April 10, 2014, and that Morrissey did not perform any of the subsequent AVF interventions, including the coil embolization, the ligation of the radiocephalic AVF, and the several angioplasty procedures. Dr. Scher averred that none of the decedent's neurologic complaints, including loss of function of the fingers in the left hand, had manifested themselves while he was under Morrissey's care.

Dr. Scher ultimately concluded that the development of steal syndrome was an accepted risk of the March 18, 2014 brachiocephalic AVF procedure, and not a result of any act of negligence or malpractice on the defendants' part, such as improper surgical technique, creation of the AVF at an improper location, or failure to provide adequate post-operative care. Dr. Scher opined that Morrissey timely tested for and diagnosed the decedent with steal syndrome on April 10, 2014, and that Morrissey developed an appropriate treatment plan that included a referral to Dr. Kalloo.

Dr. Winston described the decedent's medical history in greater detail than did Dr. Scher, specifically noting his diabetes and concomitant kidney disease. He essentially reiterated all of Dr. Scher's opinions, including (a) that the March 18, 2014 brachiocephalic AVF placement in the decedent's upper left arm was both indicated and the preferred method for providing an access point for continuing dialysis treatments, (b) that steal syndrome is an accepted risk of the procedure, (c) that the decedent evinced no symptoms of steal syndrome for more than two weeks after the procedure, (d) that nothing that the defendants did or did not

**805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP.**
**Motion No.  002**

**Page 10 of 23**

10 of 23

do caused the brachiocephalic AVF graft to fail, caused the onset of steal syndrome, or caused the decedent to suffer from the conditions of which he complained, (e) that Morrissey properly and timely tested for and diagnosed steal syndrome, (f) that Morrissey appropriately referred the decedent to Dr. Kalloo for treatment of steal syndrome, and that (g) the procedures performed by Drs. Shah and Kalloo ultimately revised the AVF so that it could be successfully employed in his dialysis treatment. As he phrased it, "[i]n many respects he is alive today because the AVF was placed by Dr. Morrissey in 2014."

Dr. Marshall described in detail the April 2-3, 2014 and April 7-8, 2014 emergency department examinations of the decedent at NYPH, as well as diagnostic testing, diagnoses, treatments, consultations, and treatment plans that were administered, rendered, or developed by NYPH physicians. He concluded that all NYPH medical personnel who were involved in the decedent's case satisfied the standard of care, since they administered the appropriate medications, undertook appropriate diagnostic testing, properly included steal syndrome in their differential diagnoses, and formulated a proper treatment plan that did not include immediate revision surgery, but instead included an immediate follow-up appointment with Morrissey.

In opposition to the motion, the decedent relied upon the submissions that the defendants had submitted, and submitted an attorney's affirmation, as well as the expert affidavit of board-certified vascular surgeon Russell H. Samson, M.D.

Dr. Samson first asserted that, contrary to the opinions rendered by the defendants' experts, the decedent did, in fact, evince symptoms of IMN shortly after the March 18, 2014 procedure. Specifically, he noted that the decedent's chart reflected that the decedent had complained of pain in his arm at a level of 4 out of 5 on March 20, 2014, only two days after the procedure, and that the location and severity of the pain were the "most common" types of location and severity seen with IMN. Dr. Samson further noted that the decedent complained of pain in his forearm, which was the site of the November 2013 radiocephalic AVF procedure. In this respect, he asserted that Dr. Scher inappropriately interpreted the decedent's medical

**805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK &
PRESBYTERIAN HOSP.**
**Motion No. 002**

**Page 11 of 23**

11 of 23

records in concluding that the pain was located immediately over the brachiocephalic AVF surgical site when, in fact, the records indicated that the pain was in the decedent's left arm distal to the AVF surgical site. Dr. Samson thus opined that, contrary to Dr. Scher's opinion, the decedent did indeed suffer from IMN, a type of ischemia. Dr. Samson disagreed with the defendants' experts' opinion that steal syndrome needn't have been treated on an emergent basis in the decedent's case, inasmuch as the decedent manifested signs of severe pain several weeks before his April 2, 2014 emergency room visit. As Dr. Samson characterized it, emergency treatment was warranted as early as March 20, 2014, because, by the time that the decedent appeared in the NYPH emergency room almost two weeks later, he was suffering from "excruciating" pain that the decedent evaluated at a level of 9 out of 10.

Dr. Samson expressly disagreed with Dr. Scher's conclusion that the defendants engaged in no departures from good and accepted practice. He opined that the NYPH emergency department physicians who treated the decedent departed from good and accepted medical practice during the decedent's April 2-3, 2014 emergency visit by failing to "deliver targeted intervention to arrest the [vascular] complication and avoid permanent damage to his left hand," despite the fact that the decedent "presented both emergently and in follow up with ischemic changes in his left hand caused by vascular compromise." Specifically, he alleged that the failure of the NYPH emergency room physicians to consider steal syndrome and/or IMN at the decedent's April 2, 2014 visit constituted a departure from good and accepted medical practice, and that their failure to perform an Allen Test at that time to ascertain whether such conditions were present, waiting instead until Morrissey conducted such a test on April 10, 2014, constituted a further departure. Dr. Samson faulted those physicians' determination that the conditions that the decedent presented constituted only normal, expected, and mild complications of AVF creation.

Dr. Samson also faulted the NYPH emergency department physicians for failing to order a neurology or vascular surgery consultation on April 2, 2014 or April 3, 2014, and for waiting

**805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK &
PRESBYTERIAN HOSP.**
**Motion No.  002**

**Page 12 of 23**

12 of 23

several days before contacting Morrissey. With respect to the decedent's April 7-8, 2014 emergency department visit, Dr. Samson opined that the NYPH emergency physicians continued to depart from good practice by failing to order a neurology or vascular surgery consultation and that, although at least one of those physicians reported that the decedent's conditions were "concerning" for steal syndrome, they further departed from good practice since neither she nor any of the other emergency department physicians ordered any testing for that condition, and treated it solely with pain medication.

Dr. Samson asserted that it was irrelevant that the decedent initially did not present to Morrissey at his first post-operative visit with symptoms of delayed onset IMN or steal syndrome, because the decedent ultimately "did present with signs and symptoms of ischemia and vascular compromise that required immediate intervention to arrest and reverse the condition." Thus, although Dr. Samson agreed that the March 18, 2014 AVF procedure was medically necessary, and he did not comment upon whether the procedure itself was appropriately performed, he nonetheless concluded that "the [decedent]'s course took a significant turn on April 2, 2014," when he presented to NYPD's emergency department with significant arm pain, tingling, and functional deficits. Dr. Samson also opined that the absence of redness in the decedent's arm was irrelevant to the proper diagnosis of IMN or steal syndrome, since redness is not a characteristic symptom of either condition. Moreover, he expressly rejected Dr. Scher's opinion that the allegedly "extended" time between the AVF procedure and the onset of pain, as well as Dr. Scher's conclusion that the pain was responsive to narcotics, eliminated the possibility that the decedent was suffering from IMN, or even steal syndrome, for that matter. Rather, he opined that the onset of pain only two days after the procedure did not rule out either condition, and that the presence of pain in a "strip" over the lateral forearm, that worsened over the following two weeks, should have led NYPD's emergency department physicians to suspect both conditions. Dr. Samson further averred the presence of thrill and a normal ultrasound scan "further highlight the possible of Steal and/or

805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK &          Page 13 of 23
PRESBYTERIAN HOSP.
Motion No. 002

[* 13]

13 of 23

IMN," particularly in light of the fact that the decedent did not suffer from any symptoms after his November 2013 radiocephalic AVF procedure.

As Dr. Samson explained it,

> "the [decedent]'s focal deficits acknowledged by internist expert Dr. Winston for the defendants, coupled with excruciating pain, all collectively required that post fistula ischemic complications be considered. Yet, no evidence is present as to whether the two well recognized ischemic complications of fistula creation were even considered much less ruled out.

> "The two complications are similar in that they are both issues of vascular insufficiency and lead to permanent damage if not timely treated. The first is Steal Syndrome, a complication where blood is directed away from the extremity and the extremity is deprive of sufficient blood flow usually involving all tissues including nerves, muscle and skin. The second is ischemic monomelic neuropathy, or IMN, where the blood flow is shunted away from the extremity and the disruption in flow causes damage primarily to major nerve fibers in the extremity. Simpl[y] stated IMN is Steal Syndrome affecting the nerves. It should be noted that both conditions can coexist."

He described the symptoms of steal syndrome as pain, numbness, tingling, and delayed capillary refill, predominantly in the hand, which, if severe enough and left untreated, will lead to paralysis of the hand, necrosis, and even gangrene, while he described the symptoms of IMN as immediate post-operative pain in the forearm, weakness in the hand and fingers, and "generally less ischemic features like a cold, white hand, or tissue necrosis."

Dr. Samson opined that Morrissey himself departed from good and accepted practice by referring the decedent to Dr. Kalloo for what turned out to be a non-indicated coiling procedure, when, according to Dr. Samson, Morrissey, as a vascular surgeon, should immediately have performed a banding procedure on an emergent basis. In any event, even if Morrissey declined to continue treating the decedent as his patient, Dr. Samson asserted that Morrissey's referral to Dr. Kalloo should have been effectuated immediately, rather than treated as a "deferred non-targeted intervention" that ultimately was performed on April 18, 2014. Dr. Samson averred that this delay worsened the decedent's chances for a full recovery or a better outcome. In this regard, Dr. Samson asserted that many patients with severe steal syndrome symptoms require surgery, and that although treatment methods to address the condition included banding the

**805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP.**
**Motion No.  002**

**Page 14 of 23**

14 of 23

AVF, a distal revascularization and interval ligation (DRIL) procedure, and ligation of the AVF itself, the coiling procedure performed by Dr. Kalloo was not an appropriate treatment, in that it could not and did not treat ischemia. He further asserted that the additional delay in undergoing the ligation procedure performed by Dr. Shah could only "minimally improve blood flow to the hand due to steal [syndrome] and could not improve IMN." In this respect, he opined that IMN always requires immediate intervention to reverse the ischemic harm to the arm's nerves and muscle, usually by "closing the access" thereto, that is, by closing off the AVF. He noted that, by the time that Morrissey administered the Allen Test, the decedent had difficulty opening and closing the fingers on his left hand, which Dr. Samson considered to be evidence of advancing ischemia, secondary either to severe steal syndrome or "atypically presenting IMN."

Ultimately, Dr. Samson opined that the defendants' malpractice proximately caused the decedent to sustain permanent damage to his left arm, including functional, strength, and cosmetic deficits, which manifested itself by, among other things, a clawed hand. Dr. Samson further noted that the presence of a clawed hand, without tissue loss, as was the case here, is a common feature of IMN. As he phrased it, "[e]arlier intervention would certainly have led to less functional and cosmetic deficits if not a complete cure."

Dr. Samson did not address the lack of informed consent cause of action.

In reply, the defendants submitted an attorney's affirmation, in which counsel asserted that the plaintiff's expert affidavit was insufficient to raise a triable issue of fact, inasmuch as Dr. Samson never identified the type of intervention that he believed that the defendants should have performed. Counsel also alleged that Morrissey should be awarded summary judgment because, even though the decedent alleged in his bill of particulars that the malpractice occurred between March 18, 2014 and April 8, 2014, the only departure on Morrissey's part that Dr. Samson had identified occurred on April 10, 2014 and, thus, beyond the period of claimed malpractice. Moreover, counsel asserted that, even if the court were to consider Morrissey's

**805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK &
PRESBYTERIAN HOSP.
Motion No. 002**

**Page 15 of 23**

15 of 23

alleged April 10, 2014 departures, Dr. Samson did not specify what Morrissey should have done to satisfy the appropriate standard of care.

It is well settled that the movant on a summary judgment motion "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (*Winegrad v New York Univ. Med. Ctr*., 64 NY2d 851, 853 [1985] [citations omitted]). The motion must be supported by evidence in admissible form (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]), as well as the pleadings and other proof such as affidavits, depositions, and written admissions (*see* CPLR 3212). The facts must be viewed in the light most favorable to the non-moving party (*see Vega v Restani Constr. Corp*., 18 NY3d 499, 503 [2012]). In other words, "[i]n determining whether summary judgment is appropriate, the motion court should draw all reasonable inferences in favor of the nonmoving party and should not pass on issues of credibility" (*Garcia v J.C. Duggan, Inc.*, 180 AD2d 579, 580 [1st Dept 1992]). Once the movant meets his or her burden, it is incumbent upon the non-moving party to establish the existence of material issues of fact (*see Vega v Restani Constr. Corp*., 18 NY3d at 503). A movant's failure to make a prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*see id.; Medina v Fischer Mills Condo Assn*., 181 AD3d 448, 449 [1st Dept 2020]).

"The drastic remedy of summary judgment, which deprives a party of his [or her] day in court, should not be granted where there is any doubt as to the existence of triable issues or the issue is even 'arguable'" (*De Paris v Women's Natl. Republican Club, Inc.,* 148 AD3d 401, 403-404 [1st Dept 2017]; *see Bronx-Lebanon Hosp. Ctr. v Mount Eden Ctr*., 161 AD2d 480, 480 [1st Dept 1990]). Thus, a moving defendant does not meet his or her burden of affirmatively establishing entitlement to judgment as a matter of law merely by pointing to gaps in the plaintiff's case. He or she must affirmatively demonstrate the merit of his or her defense (*see Koulermos v A.O. Smith Water Prods*., 137 AD3d 575, 576 [1st Dept 2016]; *Katz v United Synagogue of Conservative Judaism*, 135 AD3d 458, 462 [1st Dept 2016]).

**805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP.**
**Motion No.  002**

**Page 16 of 23**

"To sustain a cause of action for medical malpractice, a plaintiff must prove two essential elements: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury" (*Frye v Montefiore Med. Ctr.*, 70 AD3d 15, 24 [1st Dept 2009]; *see Foster-Sturrup v Long,* 95 AD3d 726, 727 [1st Dept 2012]; *Roques v Noble*, 73 AD3d 204, 206 [1st Dept 2010]; *Elias v Bash*, 54 AD3d 354, 357 [2d Dept 2008]; *DeFilippo v New York Downtown Hosp*., 10 AD3d 521, 522 [1st Dept 2004]).  Where a physician fails properly to diagnose a patient's condition, thus providing less than optimal treatment or delaying appropriate treatment, and such insufficient care or delay proximately causes injury, he or she will be deemed to have departed from good and accepted medical practice (*see Zabary v North Shore Hosp. in Plainview,* 190 AD3d 790, 795 [2d Dept 2021]; *Lewis v Rutkovsky*, 153 AD3d 450, 451 [1st Dept 2017]; *Monzon v Chiaramonte*, 140 AD3d 1126, 1128 [2d Dept 2016] ["(c)ases . . . which allege medical malpractice for failure to diagnose a condition . . .  pertain to the level or standard of care expected of a physician in the community"]; *O'Sullivan v Presbyterian Hosp. at Columbia Presbyterian Med. Ctr.*, 217 AD2d 98, 101 [1st Dept 1995]).

To make a prima facie showing of entitlement to judgment as a matter of law, a defendant physician moving for summary judgment must establish the absence of a triable issue of fact as to his or her alleged departure from accepted standards of medical practice (*Alvarez v Prospect Hosp*., 68 NY2d 320, 324 [1986]; *Barry v Lee*, 180 AD3d 103, 107 [1st Dept 2019]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24) or establish that the plaintiff was not injured by such treatment (*see Pullman v Silverman,* 28 NY3d 1060, 1063 [2016]; *McGuigan v Centereach Mgt. Group, Inc.*, 94 AD3d 955 [2d Dept 2012]; *Sharp v Weber*, 77 AD3d 812 [2d Dept 2010]; *see generally Stukas v Streiter*, 83 AD3d 18 [2d Dept 2011]).  To satisfy this burden, a defendant must present expert opinion testimony that is supported by the facts in the record, addresses the essential allegations in the complaint or the bill of particulars, and is detailed, specific, and factual in nature (*see Roques v Noble*, 73 AD3d at 206; *Joyner-Pack v Sykes*, 54 AD3d 727, 729 [2d Dept 2008]; *Koi Hou Chan v Yeung*, 66 AD3d 642 [2d Dept 2009];

**805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK &                   Page 17 of 23**
**PRESBYTERIAN HOSP.**
**Motion No.  002**

17 of 23

*Jones v Ricciardelli*, 40 AD3d 935 [2d Dept 2007]). If the expert's opinion is not based on facts in the record, the facts must be personally known to the expert and, in any event, the opinion of a defendant's expert should specify "in what way" the patient's treatment was proper and "elucidate the standard of care" (*Ocasio-Gary v Lawrence Hospital,* 69 AD3d 403, 404 [1st Dept 2010]). Stated another way, the defendant's expert's opinion must "explain 'what defendant did and why'" (*id.*, quoting *Wasserman v Carella*, 307 AD2d 225, 226 [1st Dept 2003]). Moreover, as noted, to satisfy his or her burden on a motion for summary judgment, a defendant must address and rebut specific allegations of malpractice set forth in the plaintiff's bill of particulars (*see Wall v Flushing Hosp. Med. Ctr.*, 78 AD3d 1043 [2d Dept 2010]; *Grant v Hudson Val. Hosp. Ctr.*, 55 AD3d 874 [2d Dept 2008]; *Terranova v Finklea*, 45 AD3d 572 [2d Dept 2007]).

Once satisfied by the defendant, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact by submitting an expert's affidavit or affirmation attesting to a departure from accepted medical practice and/or opining that the defendant's acts or omissions were a competent producing cause of the plaintiff's injuries (*see Roques v Noble*, 73 AD3d at 207; *Landry v Jakubowitz*, 68 AD3d 728 [2d Dept 2009]; *Luu v Paskowski*, 57 AD3d 856 [2d Dept 2008]). Thus, to defeat a defendant's prima facie showing of entitlement to judgment as a matter of law, a plaintiff must produce expert testimony regarding specific acts of malpractice, and not just testimony that contains "[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice" (*Alvarez v Prospect Hosp.,* 68 NY2d at 325; *see Frye v Montefiore Med. Ctr.,* 70 AD3d at 24). In most instances, the opinion of a qualified expert that the plaintiff's injuries resulted from a deviation from relevant industry or medical standards is sufficient to preclude an award of summary judgment in a defendant's favor (*see Murphy v Conner*, 84 NY2d 969, 972 [1994]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24).

In the first instance, the court notes that, although Dr. Samson's affidavit was sworn to and executed in Florida, it was not accompanied by the certificate of conformity required by

**805314/2016 HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP.**
**Motion No. 002**

**Page 18 of 23**

18 of 23

CPLR 2309. A certificate of conformity is a written instrument, pursuant to which a person qualified by the laws of the state in which an affidavit or affirmation is executed and notarized, or by the laws of New York, certifies that the out-of-state affidavit or affirmation has indeed been drafted, executed, and notarized in conformity with the laws of that state. The absence of the certificate of conformity, however, does not require the court to disregard or reject Dr. Samson's affidavit, as the failure to include a certificate of conformity is a mere irregularity that may be cured by the submission of the proper certificate nunc pro tunc (*see Khurdayan v Kassir*, 223 AD3d 590, 591 [1st Dept 2024]; *Parra v Cardenas,* 183 AD3d 462, 463 [1st Dept 2020]; *Bank of New York v Singh*, 139 AD3d 486, 487 [1st Dept 2016]; *DaSilva v KS Realty, L.P.,* 138 AD3d 619, 620 [1st Dept 2016]; *Diggs v Karen Manor Assoc., LLC*, 117 AD3d 401, 402-403 [1st Dept 2014]; *Matapos Tech., Ltd. v Compania Andina de Comercio Ltda.*, 68 AD3d 672, 673 [1st Dept 2009]). Moreover, the court rejects the defendants' contention that it may not consider so much of Dr. Samson's affidavit as provided an opinion as to Morrissey's alleged departures on April 10, 2014, which they assert was beyond the time period of Morrissey's alleged malpractice, as set forth in the bill of particulars. A bill of particulars, however, is not required to include evidentiary information, and Dr. Samson's affidavit did not present a new theory of recovery, but only a specific instance of post-operative care, as alleged in the bill of particulars, that did not conform to the appropriate standard of care (*see Lawi v Complete Wellness Med., P.C.*, 2020 NY Slip Op 33659[U], *7, 2020 NY Misc LEXIS 9936, *8 [Sup Ct, N.Y. County, Oct. 28, 2020]). Hence, the court will consider Dr. Samson's opinions with respect to Morrissey (*see id.*).

The defendants established their prima facie entitlement to judgment as a matter of law by demonstrating, through the medical records and their experts' affirmations, that they did not depart from good and accepted medical practice, and that nothing that they did or failed to do caused or exacerbated any neurological, vascular, or other injury to the plaintiff. Inasmuch as Dr. Samson did not address the quality or propriety of the performance of the March 18, 2014 surgery itself, and the medical records clearly reflect that NYPH emergency physicians did, in

**805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP.**
**Motion No.  002**

**Page 19 of 23**

19 of 23

fact, order a vascular surgery consultation that was undertaken during the decedent's visit to the NPYH emergency department, summary judgment must be awarded to the defendants dismissing claims of surgical malfeasance and malpractice based on failure to order a vascular surgery consultation.

The plaintiff, however, raised triable issues of fact as to whether the NYPH defendants departed from good and accepted medical practice by failing to include IMN or steal syndrome in their April 2-3, 2014 differential diagnosis, failing to perform an Allen Test, failing to order a neurological consultation, and failing to perform an emergent banding or ligation procedure on the brachiocephalic AVF, and, although they included steal syndrome as a "concern" in their April 7-8, 2014 diagnosis, by failing to perform the same test, order the same consultation, or perform those same procedures during the decedent's second emergency department visit. Contrary to the defendants' contention, Dr. Samson did, in fact, specify what the proper intervention should have been at that juncture.

The plaintiff also raised triable issues of fact as to whether Morrissey departed from good and accepted practice by delaying surgical intervention once he had diagnosed steal syndrome on April 10, 2014. Once again, contrary to the defendants' contention, Dr. Samson did, in fact, specify what the proper intervention should have been at that juncture, explaining that the implantation of coils was improper, but that immediate banding or two different types of ligation procedure should have been performed on an emergent basis. Dr. Samson, in his affidavit, explicitly explained the way in which those departures caused or allowed the plaintiff's condition to worsen, and deprived him of an opportunity for a cure or a better outcome (*see Mortensen v Memorial Hosp.*, 105 AD2d 151, 156, 159 [1st Dept 1984]; *Kallenberg v Beth Israel Hosp.*, 45 AD2d 177, 178 [1st Dept 1974], *affd no op.* 37 NY2d 719 [1975]).

The elements of a cause of action to recover for lack of informed consent are:

> "(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable

**805314/2016   HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP.**
**Motion No.  002**

**Page 20 of 23**

[* 20]

medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury"

(*Spano v Bertocci*, 299 AD2d 335, 337-338 [2d Dept 2002]; *see Zapata v Buitriago*, 107 AD3d 977, 979 [2d Dept 2013]; *Balzola v Giese*, 107 AD3d 587, 588 [1st Dept 2013]; *Shkolnik v Hospital for Joint Diseases Orthopaedic Inst*., 211 AD2d 347, 350 [1st Dept 1995]). For a statutory claim of lack of informed consent to be actionable, a defendant must have engaged in a "non-emergency treatment, procedure or surgery" or "a diagnostic procedure which involved invasion or disruption of the integrity of the body" (Public Health Law § 2805-d[2]). "'[T]his showing of qualitative insufficiency of the consent [is] required to be supported by expert medical testimony'" (*King v Jordan*, 265 AD2d at 260, quoting *Hylick v Halweil*, 112 AD2d 400, 401 [2d Dept 1985]; *see* CPLR 4401-a; *Gardner v Wider*, 32 AD3d 728, 730 [1st Dept 2006]).

"A failure to diagnose cannot be the basis of a cause of action for lack of informed consent unless associated with a diagnostic procedure that 'involve[s] invasion or disruption of the integrity of the body'" (*Janeczko v Russell*, 46 AD3d 324, 325 [1st Dept 2007], quoting Public Health Law § 2805-d[2][b]; *see Lewis v Rutkovsky*, 153 AD3d at 456). In addition to invasive diagnostic testing arising from a failure properly to diagnose a medical condition, the administration of nonindicated medications arising from a misdiagnosis may also be the basis for a lack of informed consent cause of action (*see Lyons v Vassar Bros. Hosp*., 30 AD3d 477, 478 [2d Dept 2006]). The decedent here initially alleged that Morrissey negligently performed the March 18, 2014 brachiocephalic AVF procedure. Since his expert did not address that contention in opposition to the defendants' prima facie showing that the procedure was properly performed---leaving only allegations that the defendants failed timely to recognize, diagnose, and treat IMN and steal syndrome---summary judgment must be awarded to the defendants dismissing the lack of informed consent cause of action.

**805314/2016  HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP.**
**Motion No.  002**

**Page 21 of 23**

21 of 23

"'In general, under the doctrine of respondeat superior, a hospital may be held vicariously liable for the negligence or malpractice of its employees acting within the scope of employment, but not for negligent treatment provided by an independent physician, as when the physician is retained by the patient himself'" (*Valerio v Liberty Behavioral Mgt. Corp*., 188 AD3d 948, 949 [2d Dept 2020], quoting *Seiden v Sonstein*, 127 AD3d 1158, 1160 [2d Dept 2015]; *see Hill v St. Clare's Hosp*., 67 NY2d 72, 79 [1986]; *Dupree v Westchester County Health Care Corp*., 164 AD3d 1211, 1213 [2d Dept 2018]). Since all of the emergency room physicians at NYPH who examined and treated the decedent were NYPH's employees, and Morrissey was NYPH's employee as well, to the extent that there are triable issues of fact as to the negligence of those persons, summary judgment must be denied to NYPH as well with respect to those triable issues of fact.

Accordingly, it is,

ORDERED that the defendants motion is granted to the extent that they are awarded summary judgment dismissing the lack of informed consent cause of action, and any claims of medical malpractice premised upon the alleged improper performance of the surgical procedure performed on the plaintiff's decedent on March 18, 2014 and the alleged failure of the physicians employed by the defendant The New York and Presbyterian Hospital to order a vascular surgery consultation during the plaintiff's decedent's two post-operative emergency thereat on April 2-3, 2014 and April 7-8, 2014, the motion is otherwise denied, and that cause of action and those claims are dismissed; and it is further,

ORDERED that that the parties shall appear for an initial pretrial settlement conference before the court, in Room 204 at 71 Thomas Street, New York, New York 10013, on November 13, 2024, at 11:00 a.m., at which time they shall be prepared to discuss resolution of the action and the scheduling of a firm date for the commencement of jury selection.

**805314/2016  HOEPELMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP.**
**Motion No. 002**

**Page 22 of 23**

[* 22]

22 of 23

This constitutes the Decision and Order of the court.

__10/1/2024__
DATE

JOHN J. KELLEY, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | | GRANTED | | DENIED | X | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

805314/2016  HOEPEMAN, CARMEN, as admr. of estate of NIEVES vs. NEW YORK & PRESBYTERIAN HOSP.
Motion No.  002

Page 23 of 23

23 of 23